IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 3, 2021

## IN RE JAYDA J. ET AL.

**Appeal from the Circuit Court for Putnam County**
**No. 2019-CV-012   Amy V. Hollars, Judge**

_____

### No. M2020-01309-COA-R3-PT
_____

In this parental rights termination case, the trial court ruled that DCS proved five grounds for terminating Mother's parental rights to her two children: mental incompetence, persistence of conditions, abandonment by failure to support, abandonment by failure to provide a suitable home, and failure to manifest a willingness and ability to assume custody of the children. The trial court also ruled that termination of Mother's rights was in the children's best interest. We reverse the trial court's rulings as to the grounds of mental incompetence and abandonment by failure to support. We also reverse the trial court's ruling that termination of Mother's rights is in the children's best interests.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed in Part, Affirmed in Part.**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and W. NEAL MCBRAYER, JJ., joined.

Dana R. Looper, Cookeville, Tennessee, for the appellant, Melissa W.

Herbert H. Slatery, III, Attorney General and Reporter; Kristen Kyle-Castelli, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

M. Anne Austin, Cookeville, Tennessee, Guardian ad Litem.

Selena L. Flatt, Cookeville, Tennessee, Attorney ad Litem.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

This case has a long and protracted history, so we highlight only the major events in this background section and will address specific facts as relevant in the discussion section. Melissa W. ("Mother")[1] and James J. ("Father")[2] are the parents of Jayda J., born in July 2009, and Javon J., born in August 2010, (collectively, "the children"). The children were born in Florida, where Mother and Father lived at the time. Mother moved to Tennessee in 2014 with the children, where she has lived with her father ever since in his three-bedroom home. Mother is her father's caretaker, as he suffers from various health ailments. Mother also suffers from health issues, including seizures and cancer.

The Tennessee Department of Children's Services ("DCS") filed a petition to declare Jayda dependent and neglected and for emergency temporary legal custody on May 15, 2017 in the Juvenile Court of Putnam County (the "juvenile court").[3] In its petition, DCS alleged that on April 3, 2017, a referral was made to DCS for "medical neglect"[4] because Jayda had a fungus on her toe that Mother had not addressed. The petition further alleged that on April 6, 2017, DCS was called out to Mother's home by a counselor because Jayda and Javon were being aggressive toward Mother and had to be restrained by the counselor and Mother. According to DCS, Mother "reported that she did not feel that it was safe for her or for the children to stay in the home that weekend because of their behaviors. [The children] were placed in [temporary] care on April 6, 2017 through April 10, 2017 due to the children's unruly and defiant behaviors." The petition further stated that during a Child and Family Team Meeting ("CFTM") on May 15, 2017, Mother stated that she could not allow Jayda to return home due to her behavior, and felt that it would be best for Jayda to be placed in a therapeutic foster home. Javon returned to Mother's care on approximately April 10, 2017.

In an order entered on August 9, 2017, *nunc pro tunc* to July 27, 2017, the juvenile court granted a default adjudication as to Mother, due to her having been properly served and failing to appear, and finding that Jayda was dependent and neglected but not a victim of severe child abuse. Other than the medical neglect referral, the juvenile court appears to have based its finding of dependency and neglect primarily on Jayda's behavioral issues and Mother's contention that it would be best for Jayda to be placed in a therapeutic foster home.

---

[1] It appears from the record that Mother is known both as "Melissa" and "Missy." Additionally, this Court's policy is to protect minors' privacy in cases such as this by using only the first name and last initial of the parties. *See **In re C.W.***, 420 S.W.3d 13, 15 n.1 (Tenn. Ct. App. 2013).

[2] Father's parental rights are not at issue in this appeal, so we omit most of the details regarding his role in this case.

[3] In its petition, DCS relied on Tennessee Code Annotated section 37-1-128(b)(2) and Tennessee Rule of Juvenile Procedure 5(d)(1). The juvenile court also relied on these in its order on the petition. Neither of these was in effect at the time of the filing of the petition. Section 37-1-128(b) was deleted in 2016. The Tennessee Rules of Juvenile Practice and Procedure were revised and re-ordered in 2016.

[4] According to Stephanie Weeks, a DCS caseworker who worked on the case from December 2017 through February 2019, she does not know who made the original medical neglect referral to DCS.

On March 16, 2018, DCS filed a petition in the juvenile court to declare Javon dependent and neglected.[5] Therein, DCS alleged, *inter alia*, that it received a referral for allegations of a drug exposed child on March 14, 2018; Mother met with a DCS case manager and submitted to an unannounced urine drug screen, first attempting to falsify the urine drug screen before submitting to it again; the urine drug screen revealed that Mother tested positive for methamphetamine and amphetamine, but negative for THC; Mother exhibited erratic behavior and "paranoid type personality"; Javon had behavior issues at school and at home; Mother lacked the ability to properly parent Javon due to her "substance abuse use"; and Mother had tested positive for methamphetamine after submitting to a random urine drug screen with Ms. Weeks on March 8, 2018.[6]

In an adjudication and final disposition hearing order entered June 13, 2018, *nunc pro tunc* to May 24, 2018, the juvenile court again granted a default adjudication against Mother, finding Javon dependent and neglected but not a victim of severe child abuse. It appears the juvenile court primarily relied on Mother's drug issues in adjudicating Javon dependent and neglected. Multiple permanency plans were then created and ratified over the course of this case.[7]

DCS filed a petition to terminate Mother's and Father's parental rights on January 23, 2019 in the Circuit Court of Putnam County (the "trial court").[8] Therein, DCS alleged that termination of Mother's rights was warranted based on the following grounds: Mother's incompetence to parent the children; abandonment by failure to support; abandonment by failure to establish a suitable home; persistence of conditions; and failure to manifest an ability and willingness to assume legal and physical custody or financial responsibility for the children. The trial court found Mother and Father each to be indigent

---

[5] Again, DCS erroneously cited Tennessee Code Annotated section 37-1-128(b)(2) and Tennessee Rule of Juvenile Procedure 5(d)(1) in its petition. *See* footnote 3, *supra*.

[6] It is unclear if this date is a typo and should actually refer to a date after March 14, 2018.

[7] We also note that the four copies of the Criteria & Procedures for Termination of Parental Rights that DCS provided Mother between January 2018 and March 2019 misstate the law—they repeatedly emphasize that parental rights can be terminated for *willfully* failing to support a child. Of course, that is the standard under Tennessee Code Annotated section 36-1-102 (1)(I) effective before July 1, 2018. The statute was thereafter amended to remove the requirement that the petitioner prove that the parent's failure to support was willful. DCS caseworkers reviewed these erroneous criteria with Mother, and the juvenile court repeatedly found that Mother had been provided the criteria in compliance with section 37-2-403(a), which states, in relevant part: "Within thirty (30) days of the date of foster care placement, an agency shall prepare a plan for each child in its foster care," and "[t]he permanency plan . . . shall include the definitions of 'abandonment' . . . contained in § 36-1-102 and the criteria and procedures for termination of parental rights." DCS clearly failed to comply with this statutory mandate by providing Mother with outdated and misleading information, and should take considerably more care in performing its duties, especially given the gravity of the rights at stake in these proceedings.

[8] Father was incarcerated in Florida at the time the petition was filed.

and appointed them separate counsel. Both a Guardian ad Litem ("GAL") and an Attorney ad Litem ("AAL") were eventually appointed for the children.[9]

After being re-set multiple times, the trial on the petition to terminate parental rights began on December 11, 2019, and continued on February 20, 2020, March 2, 2020, June 10, 2020, July 17, 2020, and August 6, 2020.[10] The following people testified in person: Ms. Weeks; Mother; Jamie Johnson, the DCS caseworker who took over when Ms. Weeks left in March 2019; Alicia Wright, Ms. Johnson's supervisor (and a "teammate" of Ms. Weeks'); and Jaryn Turnage,[11] a Social Service Representative at Parkridge Valley Hospital ("PVH") (a level IV psychiatric hospital for children where, as discussed *infra*, Jayda was admitted), who was qualified as an expert in counseling. Father testified via telephone from a correctional institution in Florida.

According to Ms. Weeks, Mother reported "significant trauma from her past," and there were concerns with Mother's ability to follow through and maintain stability, so Ms. Weeks "didn't feel that we would have a good glimpse as to what direction to take [Mother] unless we got an official psychological evaluation with very clear recommendations for her." Therefore, in a permanency plan developed on April 2, 2018, DCS directed Mother to complete a psychological assessment with a parenting component. Scott Herman, a Senior Psychological Examiner with a Master of Arts in Clinical/Counseling Psychology, performed an intake evaluation of Mother on June 20, 2018. He then performed a clinical parenting intervention assessment on August 31, 2018, and another clinical parenting intervention assessment on July 3, 2019. He was deposed on January 22, 2020.[12]

There was also considerable testimony about Mother's living situation. Her boyfriend ("Boyfriend")[13] lives with her, though it is unclear when he moved in. Boyfriend's mother also moved into Mother's father's home in mid-2018, when Mother did not think her children could return home. Boyfriend, his mother, and Mother have struggled with substance use issues. Mother has been in and out of drug treatment with mixed results, though she successfully completed it at least once. The record is somewhat unclear as to Mother's precise history with drugs and incarceration. According to Ms. Weeks, February of 2018 was the first time "anything [appeared] in the legal paperwork regarding drug issues." Ms. Weeks asserted that these drug issues were related to a probation violation by Mother, which Mother was in jail for when Ms. Weeks received the

---

[9] The AAL was appointed because the children had a conflicting view with that of the GAL as to whether termination of parental rights was in their best interest; they undisputedly wish to remain in Mother's custody. *See generally* Tenn. R. Sup. Ct. 40(e) (allowing the appointment of an AAL when the child asks the GAL to advocate for a position that the GAL believes is not in his or her best interest).

[10] The final hearing took place over video conference, due to COVID-19. This hearing did not involve the presentation of proof, but merely the oral ruling of the trial court.

[11] Ms. Turnage is also known as Jaryn Davis.

[12] During the deposition, the parties stipulated to Mr. Herman's expertise.

[13] He is alternatively referred to in the record as Mother's fiancé.

case.[14] Mother's testimony corroborates that she was in jail during that time for a probation violation. However, other evidence in the record suggests that the probation violation was caused by Mother driving on a suspended license, not drugs. Either way, Ms. Weeks did not know what the original charge was that Mother had been on probation for (though she stated that Mother did eventually get off of probation). According to Mother, it appears that the original charge was related to marijuana. In any event, as of July 2020, Mother testified that the only remaining legal issue she had was one final payment on her driver's license—she paid $900.00 in July and owed $300.00 more, after which she would get her license back.

Prior to the children's current custodial episode, they were in DCS custody from early September 2015 to early March 2016. The only evidence regarding the 2015 custodial episode is a notation in one of Ms. Turnage's case recording summaries. That notation states that Mother said that she was arrested for driving on a suspended driver's license and not paying an outstanding speeding ticket in Florida, so she spent three days in jail and her father called DCS to put the children in custody. The children were returned to Mother for a ninety-day trial visit in March 2016, and she ultimately was awarded custody back in June 2016. According to Ms. Wright, Mother required help ten days into the trial home visit because she was struggling with the children's behavior.

When the termination trial began, Jayda was ten years old and Javon was nine years old; neither was placed in a confirmed pre-adoptive home. Jayda was admitted to PVH on May 22, 2017. She stayed there until February 2018, when she was discharged and stepped down to a therapeutic foster home for approximately six months. Jayda returned to PVH on September 10, 2018, and remains there. Ms. Turnage oversaw the family in this case from Jayda's first admission to PVH until Ms. Turnage left PVH in November 2019. Ms. Turnage said that "[d]uring [her] work with Jayda, [Jayda] never faltered from wanting to go home to Mo[ther]."[15] According to Ms. Turnage, Jayda was originally admitted to PVH for treatment regarding homicidal ideation, suicidal ideation, and self-injurious behavior in the form of head banging and hair pulling, and while there, was diagnosed with bipolar disorder, generalized anxiety, Post-Traumatic Stress Disorder ("PTSD"), and Oppositional Defiant Disorder. When Jayda was re-admitted to PVH in September 2018, it was for similar behaviors as those that prompted her first admission. According to Ms. Turnage, Mother and Jayda "seem to parallel each other," i.e., "when Mo[ther] is doing very well, Jayda is doing very well." Ms. Turnage, who was qualified as an expert witness at trial,

---

[14] A judicial review hearing order from the juvenile court, filed on August 11, 2017, pursuant to a hearing on July 27, 2017, states that Mother was incarcerated twice since Jayda came into custody. However, no evidence in the record shows that Mother was incarcerated twice since Jayda was in custody beginning in May 2017—in fact, the evidence in the record shows that Mother was only incarcerated for one period of time since then, from November 12, 2017 through February 1, 2018.

[15] We note that in Ms. Turnage's case recording summaries in the record, she notes, "Jayda states that she wants to be adopted." However, it is unclear what time period that notation is in reference to. Furthermore, Ms. Turnage's testimony at trial was unequivocal that Jayda wants to return to Mother.

also opined that Jayda is emotionally regressing due to being in an institutional setting, and that she is ready and needs to step down from PVH. Further, Ms. Turnage testified that it is in Jayda's best interest for Mother's parental rights not to be terminated, even if Mother relapsed and reunification was delayed by as much as six months. Moreover, Ms. Turnage testified that compared to other parents with whom she had worked, Mother made "tremendous progress," indicating that Mother could make adjustments to her life so as to allow reunification.

Javon has also experienced some behavioral issues, but not to the extent Jayda has. The children are bonded with each other, though there is some indication in the record that they feed off of each other's behavioral problems.

Ms. Johnson testified that there is a foster family that has expressed interest in being a placement for Jayda, where the parents have specialized training, the family has had "difficult" children in their home before, and those placements have been successful (though Ms. Johnson did not know if the children who have been placed in that home in the past had the same psychiatric issues as Jayda). Ms. Johnson further testified that "once Jayda is able to step down and she's stable in the [foster] home and is doing well there, the[ foster family is] open to the possibility of Javon being able to also join that household." At the time of trial, Javon was in a foster home where the parent was at one time "willing to consider adopting [him]," but "had indicated . . . that she did[ not] think she would be able to maintain both children." However, Ms. Weeks could not say whether Javon's foster parent was still interested in adopting Javon by the time of trial.

The trial court granted DCS's petition in a final order entered September 2, 2020, *nunc pro tunc* to August 8, 2020. The trial court found DCS had proven all five grounds it had alleged, and that termination was in the children's best interest. Mother timely appealed.

## ISSUES PRESENTED

Mother raises the following issues on appeal, taken from her brief, and which DCS essentially echoes:[16]

1. Whether the trial court's findings on the statutory grounds for termination are supported by clear and convincing evidence.
2. Whether the trial court's best interest determination is supported by clear and convincing evidence.

## STANDARD OF REVIEW

---

[16] The attorneys appointed for the children also filed briefs in this matter. Essentially, the GAL's brief supports DCS's position, while the AAL's brief supports Mother's position.

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *Id.* at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citations and quotations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "'situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence: (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See In re Valentine*, 79 S.W.3d at 546.

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523–24 (citations omitted). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* at 524 (citation omitted).

### DISCUSSION

### I. Grounds for Termination[17]

### A. Mental Incompetence

DCS argues, and the trial court found, that Mother's parental rights should be terminated on the ground of mental incompetence to parent, pursuant to Tennessee Code Annotated section 36-1-113(g)(8), which states:

---

[17] References to the statutes governing grounds for termination are to the versions in effect when the petition for termination was filed in this case.

(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parents or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child;

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]

We have previously explained that

[t]he standard for this issue has been described as inquiring as to whether "by clear and convincing evidence [] the parent of the child is incompetent to adequately provide care and supervision because the parent's mental condition is so impaired and likely to remain so that it is unlikely that the parent will be able to assume care and responsibility for the child in the future." *State Dept. of Children's Services v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430, at *14 (Tenn. Ct. App. May 30, 2002), *no appl. perm. appeal filed.* This Court has affirmed this ground, in one instance, where the parent "functioned in such a low range that no amount of training, education, or counseling 'could bring him up to the level where he could parent these children.'" *State, Dept. of Children's Services v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008).

*In re Lorenda B.*, No. M2016-01841-COA-R3-PT, 2017 WL 1416858, at *9 (Tenn. Ct. App. Apr. 19, 2017).

In finding that DCS proved this ground, the trial court made the following findings:

52. The Court has before it the clear and affirmative testimony of Scott Herman. There was no contrary or opposing testimony of an expert on this issue.

53. There was some indication that [Mother] may have attempted to get some other psychological evaluation that was not presented to the Court.[18]

54. Mr. Herman evaluated [Mother] on two occasions. On the first occasion in 2018, he found that she was completely overwhelmed by the admittedly very difficult parenting responsibilities having to do with Jayda who had severe behavioral issues and mental health challenges. The testimony also showed that Javon would feed off Jayda's behaviors and become aggressive and difficult to control.

55. Mr. Herman found that [M]other was not able to meet the challenges of parenting due to her own very real and sometimes severe mental health issues, including post-traumatic stress disorder, severe anxiety, depression and some indication of paranoia.

56. Most importantly was Mr. Herman's testimony that a parent using methamphetamine would not be competent to parent a child. That is not only because of the impairment that the drug caused on the parent, but also because of the machinations, many of them illegal, to access the drug and that also brings the children into a dangerous situation.

57. Mr. Herman took all of these things into account and opined very clearly that [Mother] was not competent to parent these children.

The testimony relied upon by DCS at trial consisted primarily of Mr. Herman's deposition and reports.[19] And while Mr. Herman performed two evaluations on Mother, there is no dispute that only the September 2018[20] evaluation report was valid; according

---

[18] The trial court apparently made an adverse inference from Mother's failure to provide opposing expert testimony. First, as we explain, Ms. Turnage's testimony touches on Mother's competence to parent. Second, it appears, according to Mr. Herman's testimony, that this other evaluation Mother received was an IQ test. Given that Mr. Herman testified that he had already performed the equivalent of an IQ test and found that Mother did not have an intellectual disability, we do not see what adverse inference is to be taken from the failure to present the results of the second IQ test.

[19] During closing arguments, counsel for DCS stated that DCS's claim of incompetence "comes 100 percent from Mr. Scott Herman's deposition."

[20] Mr. Herman performed an intake evaluation in June 2018 and testing in August 2018, issuing a final report in September 2018.

to Mr. Herman, no conclusions can be drawn from the second evaluation in July 2019, so we will not consider it further.[21] With regard to the results of the first evaluation, Mr. Herman opined that Mother suffers from depression, anxiety, distress, and PTSD. Mr. Herman never testified, however, that these diagnoses alone mean that Mother is incompetent to parent. Instead, he opined that these diagnoses only result in an inability to parent if the parent is not treating the issues with medication and counseling, or is continuing to use illegal drugs, which Mr. Herman opined makes a parent essentially per se incompetent. Still, Mr. Herman agreed that Mother possessed adequate parenting knowledge and intellectual functioning.

Thus, Mr. Herman's testimony indicates that Mother would be rendered incompetent to parent if she was not seeking appropriate treatment for her issues or was continuing to use drugs.[22] The problem with this opinion, of course, is that Mr. Herman last successfully evaluated Mother in June and August of 2018, approximately two years before the final trial date. Since that time, Ms. Turnage testified that Mother had made significant progress in her ability to parent.

What is more, the testimony from DCS workers about Mother's compliance with mental health treatment is so vague as to be of no assistance. For example, Ms. Weeks testified that Mother's mental health status had not improved by the time Ms. Weeks filed the termination petition, but when asked what Mother's mental health diagnoses are, Ms. Weeks did not even know. The DCS workers otherwise broadly testified that Mother did not comply with the permanency plan requirements regarding mental health, but also testified that Mother was seeking mental health treatment. For example, Ms. Weeks testified that Mother reported that she was going to therapy and that Mother did provide her with records from Plateau Mental Health regarding this treatment. But Ms. Weeks could "not recall what those said." Ms. Weeks was Mother's caseworker from December 2017 through the end of February 2019. Later, Ms. Johnson, who began to work with Mother in March 2019 up until the final trial date, testified that Mother was receiving counseling and medication from Infinite Possibilities. Mother confirmed in her testimony that she was receiving treatment with this provider and at Plateau Mental Health. At best, the evidence was conflicting that Mother was not participating in treatment as required to address her mental health issues. This falls short of clear and convincing proof that Mother lacked mental competence.

While we acknowledge that Mother's sobriety is precarious and therefore may not be lasting, *infra*, there can also be no dispute that Mother was sober by the time of the last three hearing dates, at the very latest. Mother entered a hair follicle drug screen from May

---

[21] Mr. Herman testified that Mother "present[ed] herself in an unrealistically positive light" in the second evaluation, and thus that he was "not able to draw any conclusions regarding her functioning based on those test results."

[22] Many of Mr. Herman's conclusions were based on hypothetical scenarios.

2020 into evidence at trial on June 10, 2020, which indicated she was clean of drugs. DCS performed another drug screen on her in June 2020, which was again negative. Additionally, Mother testified that the neighbor that she, Boyfriend, and Boyfriend's mother had purchased drugs from is no longer living in her neighborhood because he was evicted. And Ms. Johnson and Ms. Wright admitted that Mother looked much better during the final hearing dates than when she was in the throes of her drug addiction. This ground for termination explicitly provides that the parent must be "presently [] impaired" by a mental condition. Tenn. Code Ann. § 36-1-113(g)(8)(B)(i); *see also Black's Law Dictionary* 1302 (9th ed. 2009) (defining "present" as "[n]ow existing"). DCS has provided no authority for the proposition that a drug addiction where the parent is currently sober alone constitutes a "present[]" mental condition for purposes of this ground for termination. As such, Mother's past addiction alone does not appear to constitute clear and convincing proof sufficient to support this ground for termination.

DCS cites no case in which analogous facts were sufficient to sustain this ground for termination. Instead, the cases cited by DCS are distinguishable. For example, in support of its claim that it can rely on the proof provided by the DCS caseworkers in this case to prove this ground, rather than expert testimony, DCS cites **In re Shaneeque M.**, No. E2014-00795-COA-R3-PT, 2014 WL 6499972, at *9 (Tenn. Ct. App. Nov. 20, 2014) ("[E]xpert testimony on the effect of a parent's mental illness on his or her ability to parent a child is not required."). In that case, however, the parent "refuse[d] to follow through with recommendations for treatment. She ha[d] demonstrated a pattern of living with abusive men, using illegal drugs, and abusing alcohol. During the trial, [she] was 'yelling' at the bench and her answers to questioning were often unresponsive; other replies were untruthful and evasive." *Id.* Thus, this Court considered that to be "ample evidence in the record to establish that Mother suffers from mental incompetence," despite the lack of expert proof. *Id.* In another case lacking expert proof, the parent "testified at great length about her concerns over her or the child being victimized by human organ traffickers, satanic conspirators, and other alleged nefarious forces[.]" **In re Lorenda B.**, 2017 WL 1416858, at *10.

Here, the testimony shows that Mother's only mental health diagnoses are anxiety, depression, distress, and PTSD. While the law does not require that DCS provide expert proof in all circumstances to support this ground for termination, DCS chose to provide such proof in this case. That proof established that Mother's diagnoses alone are not sufficient to show incompetence to parent without being coupled with a lack of treatment and/or drug use. But DCS failed to prove that Mother was currently failing to pursue treatment for her conditions or was using drugs. Under these circumstances, we must conclude that DCS simply presented insufficient proof to show that Mother was suffering from a mental condition that made her incompetent to parent her children. We need not address the final element of this ground, the children's best interest, because we conclude that DCS failed to prove by clear and convincing evidence that the other statutory elements of this ground have been met. The ground is therefore reversed.

## B. Persistence of Conditions

The next ground DCS relies on is persistence of conditions, pursuant to Tennessee Code Annotated Section 36-1-113(g)(3):

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

    (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

    (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

    (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

As we have previously explained,

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion [] that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating

parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Navada N.*, 498 S.W.3d at 605–06.

The children have been removed for more than six months, so that element of this ground is met. In holding that DCS proved this ground, the trial court made the following other pertinent findings:

48. The fact that [Boyfriend's mother] continued to be in the home all of this time is significant. [Boyfriend's mother] had been in the home since mid-2018. [Mother] testified that she had not insisted that [Boyfriend's mother] vacate the home until one month before the last hearing in this case. This was the home that she proposed the children would come back to. The testimony was clear that [Boyfriend's mother] was a methamphetamine user and that she was accessing drugs locally through a common methamphetamine provider that lived near them and they were all obtaining drugs from. The testimony showed that [Mother] was more concerned with [Boyfriend's mother] being away from her son ([Mother's] paramour) than it was to comply and get her children back into this home.

49. Additionally, Jayda has continued to have the mental health problems that contributed to her removal and [Mother's] sense of being overwhelmed with her very significant and substantial behavioral problems. It appears to the court that [M]other continues to have mental health issues. As recently as February of 2020 mother was still showing positive on drug tests for methamphetamine[23] and she candidly conceded that she had a relapse in November or December of 2019.[24] This was about a year after [Mother] knew about the filing of the petition to terminate her parental rights.

---

[23] Mother failed a drug test that she scheduled and paid for herself in February 2020, but the levels of methamphetamine shown in that test were far below what was demonstrated in November 2019. Mother argued at trial that this test reflected only the remnants of her prior use from November 2019. DCS does not specifically dispute this conclusion, and the trial court elsewhere specifically found that Mother used illegal drugs "as late as November and December" 2019.

[24] Mother contends her last drug use was in November 2019, and other than possibly the February 2020 drug test, there is no proof that Mother's drug use occurred after November 2019. Still, the trial court's finding noted in footnote 23, *supra*, undoubtedly excludes anything past December 2019 as a date upon which Mother continued to use drugs.

On appeal, Mother argues that the trial court failed to consider her recent positive behavior. As an initial matter, we note that the delay between the filing of the petition and the initial hearing, coupled with the length of the trial, which took place over a period of nine months, complicates the facts presented somewhat. We agree that Mother demonstrated, among other things, current sobriety at the time proof on the termination petition closed. But we must conclude that DCS nevertheless presented clear and convincing proof of Mother's "continued inability to provide fundamental care" to the children sufficient to prove this ground for termination.

We begin with drug use in the home. There can be no dispute that throughout the pendency of this case Mother has on multiple occasions achieved sobriety, sometimes after having the opportunity to participate in drug treatment,[25] only to relapse. Most recently, the evidence demonstrates that despite completing an in-patient drug treatment program in February 2019, Mother chose to use methamphetamine at least on one occasion in November 2019. Importantly, both the successful drug treatment and the relapse occurred after the filing of the termination petition.[26] Mother therefore knew that drug use would prevent reunification with her children.

Following this drug use, Mother did complete a reassessment for drug treatment and was recommended only aftercare. It does appear that as of May 2020, Mother was testing negative for drugs. The evidence shows that Mother was sober for between approximately five and six months by the time of the May 2020 negative test, she tested negative again in June 2020, and no evidence was presented that she used drugs for the remainder of the trial. Mother's ability to maintain this sobriety, however, remains in doubt.

One of Mother's longer periods of sobriety occurred after intensive in-patient drug treatment. Although no such in-patient treatment was recommended after her November 2019 relapse, Ms. Johnson testified that Mother was not consistent in attending the recommended aftercare until May 2020, months after her relapse. While Mother claimed that she had other responsibilities that prevented her attendance at aftercare, there is no explanation as to why Mother was able to consistently attend in the few weeks before she testified at trial. Instead, the evidence supports the conclusion that, like other periods of

---

[25] The record indicates that Mother completed a twelve-day in-patient drug treatment program in February 2019. Some of the testimony suggests this was the first time that Mother had ever successfully completed drug treatment. Mother claimed, however, that she attempted treatment via an intensive outpatient program ("IOP") four times—graduating two of those times, once with honors—before going to in-patient treatment in February 2019. Moreover, there is no dispute that Mother was unsuccessful in at least two drug treatment programs, once due to her own failure to attend, and once due to medical issues.

[26] A DCS caseworker testified that Mother sought and was offered in-patient drug treatment in October or November 2018, but that Mother delayed attending until February 2019. If Mother had attended in-patient drug treatment when it was first offered, it would have occurred prior to the termination petition being filed. Instead, Mother's own delay meant that her most significant effort at drug treatment occurred only after the filing of the termination petition.

time, Mother was simply not taking the required aftercare seriously enough until the hearing was on the horizon. Indeed, as one caseworker explained, Mother's typical pattern was to express a desire for help, but then delay engaging in the actions necessary to actually improve until a later date. Moreover, Mother's clean drug screens in May and June 2020 do not show current sobriety of a significantly longer duration than the sobriety that she chose to abandon by using illegal drugs even knowing that the permanent cessation of her relationship with her children was imminent. *But cf. **In re P. G.**,* No. M2017-02291-COA-R3-PT, 2018 WL 3954327, at *15 (Tenn. Ct. App. Aug. 17, 2018), *no perm. appeal filed* ("[I]t was [Petitioners'] burden to show that Mother continues to abuse drugs, rather than Mother's burden to prove that she does not."). Thus, Mother's history of relapse, coupled with her failure to consistently attend the recommended treatment, gives us concern that she will be able to maintain sobriety in the long-term, as she was not able to do so even after a successful in-patient treatment program.

Mother was also not the only person in her home to use drugs. Instead, Boyfriend and his mother also used drugs in November 2019, though they tested negative for drugs, along with Mother, when DCS administered a drug screen in June 2020. Mother was warned by DCS that having other drug users, including Boyfriend's mother, in her home would not benefit her sobriety or lead to reunification with the children. Mother testified that she did make some attempts to remove Boyfriend's mother from the home. However, Boyfriend's mother remained in the home until approximately June 2020, when Mother testified that she had finally gotten Boyfriend's mother to leave. Moreover, while Mother initially claimed that she could not remove Boyfriend's mother from the home, variously because she did not have the authority or resources to do so, and because Boyfriend's mother was "not well" and did not want to leave her son, Mother's testimony that she had finally done so indicates that Mother indeed had some control over whether this woman resided in the home. Mother's choice to delay action, therefore, again appears voluntary.

Boyfriend, of course, continues to live with Mother. DCS's position on Boyfriend's cohabitation with Mother is not entirely consistent, and DCS does not argue on appeal that Boyfriend's presence is an ongoing issue. Regardless, the facts show that Boyfriend was not currently attending any kind of drug treatment despite his November 2019 drug use Mother told a DCS worker that he was told by treatment providers that he was not required to do so due to working too many hours; the DCS worker testified that she had never heard of that situation before. Without some documentation to support this rather outlandish claim, Boyfriend's failure to attend any kind of drug treatment gives us serious doubts about his ability to maintain sobriety long-term. *See **Dattel Family Ltd. P'ship v. Wintz**,* 250 S.W.3d 883, 892 (Tenn. Ct. App. 2007) ("This Court . . . is not required to check common sense at the courthouse door."). Thus, while Boyfriend did pass at least one drug test in June 2020, the fact that Boyfriend did not seek treatment after his November 2019 drug use is a factor in preventing reunification with the children, so long as he remains living in the home with Mother.

- 15 -

The drugs alone were not the only issues that prevented reunification. Here, the testimony shows that Mother simply does not have the ability to parent both children simultaneously, when the children's behavioral issues escalate. Moreover, due to Mother's relapse and her delay in completing tasks,[27] visitation in this case never progressed to unsupervised visitation. *See In re Phillip I.P.*, No. E2015-01058-COA-R3-PT, 2016 WL 675540, at *12 (Tenn. Ct. App. Feb. 19, 2016) (citing as evidence of persistent conditions that the parent "never progressed to unsupervised visitation with the [c]hildren"). Mother also admitted that she occasionally drove, despite having a suspended license. This created the possibility of criminal charges against her, which could have removed Mother from the children's life once again.[28] According to Ms. Turnage, Jayda experienced anxiety when Mother was last in jail, but was paradoxically also comforted by the fact that Mother was in a controlled environment.

The situation presented in this case is analogous to *In re Quintin S.*, No. E2016-02150-COA-R3-PT, 2017 WL 2984193 (Tenn. Ct. App. July 13, 2017). In that case, the mother testified that she had been drug-free for six months by the time of the termination trial. *Id.* at *17. The evidence showed, however, that the mother was not consistent in the tasks required by DCS and that she continued to incur criminal charges in the weeks leading to trial. Under these circumstances, we held that the "[m]other's improvements in the months immediately preceding the hearing [we]re 'too little too late' in light of her long history of unstable housing and drug use as well as her criminal charges and incarcerations." *Id.*

Although not identical, the same is unfortunately true here. Mother chose to use illegal drugs months after the termination petition had been filed. She has not been consistent in her recommended aftercare. Mother also did not remove Boyfriend's mother from her home despite the issues regarding drug use until the month before the date she testified, months after the start of the termination trial. And while Boyfriend and his mother have passed at least one drug screen following the November 2019 relapse and Mother testified that none of them continuously used drugs after the November 2019 relapse, the evidence shows that Boyfriend is not currently enrolled in any kind of drug treatment. Moreover, while Mother is on the road to obtaining a license in the near future, she admitted that she sometimes drove without a license; although this criminal activity is minor and may be seen as trivial, Mother was previously jailed for this same offense. As such, when she engaged in this activity, she voluntarily undertook the real risk of yet again being removed from her children's lives.

---

[27] Another example of a delay is that DCS informed Mother that it would need to meet Boyfriend in January of 2018, if he was expected to take on a parenting role with the children. Mother did not introduce him to Ms. Weeks until July 2018.

[28] Mother testified, however, that she would soon be paying her final fine so that her license would be reinstated.

Thus, the evidence shows a multitude of voluntary actions taken by Mother that have delayed reunification with her children, demonstrating that Mother sometimes exercises poor judgment as to how her actions will affect her children. And while Mother has certainly made improvements, particularly with regard to her current sobriety, given the totality of the circumstances, these efforts have simply come too late to demonstrate that the improvements will be lasting. *See, e.g.*, ***In re Courtney N.***, No. E2012-01642-COA-R3-PT, 2013 WL 2395003, at *9 (Tenn. Ct. App. May 31, 2013) (affirming the trial court's finding that though "of late [the mother] has made some attempts to change her life, the court finds that her attempts are too little and too late"); *cf.* ***In re C.J.B.***, No. M2016-01585-COA-R3-PT, 2017 WL 2805193, at *8 (Tenn. Ct. App. June 28, 2017) (holding that changes by the mother "fail to demonstrate a lasting change that will make the home safe, stable, and permanent for the children. Mother has continued to accrue legal charges against her"). Thus, we must conclude that DCS has proven that there are conditions that prevent the children from returning to Mother's care and that these conditions are unlikely to be remedied at an early date.

Finally, we conclude that the "continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). Here, the children are strongly bonded. In an ideal world, there is little dispute that the best permanent placement for the children is together with Mother. Unfortunately, this ideal situation appears simply out of reach in the near future. DCS presented proof that even after years of assistance from DCS, Mother is still not capable of parenting both children simultaneously because she has trouble deescalating the children's behavioral issues when they are together. *But see* ***Whaley***, 2002 WL 1116430, at *14, (holding, on the ground of persistence of conditions, where the case manager testified that "[t]he problems she observed [the mother] having with [her son] included [the mother] not comforting her son, having to remind [the mother] to check his diaper, becoming frustrated with a tantrum and not knowing how to react," that such "testimony . . . [did] not constitute clear and convincing evidence that [the mother] [wa]s unable to care for her son."). While Mother could certainly continue to make progress on this issue to the point where unsupervised visitation is possible, the children have already been in custody for approximately one-third of their lives in the aggregate. And even though Ms. Turnage testified that Jayda can wait to be reunited with Mother, Mr. Herman also testified that as a general rule, "the more delays achieving permanency, the more harm." Finally, the DCS workers testified that the possibility of reunification with Mother has hampered their ability to find the children adoptive homes. As such, this ground for termination is affirmed.

### C. Failure to Manifest a Willingness and Ability to Assume Custody

DCS also argued, and the trial court found, that Mother failed "to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody . . . of the child[ren], and placing the child[ren] in [Mother's] legal and physical custody

would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14).

[S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citation omitted).

The trial court made the following findings on this ground:

61. With regard to [Mother's] ability to assume custody, the Court's previous findings bear upon this ground. The Court heard testimony about her erratic cycles, about how she would do well for a period of time and then go into a period of again using drugs which exacerbated her mental health issues. Perhaps those issues stem from certain traumatic experiences in her past and the Court does not doubt that those exist.

62. In terms of ability to assume custody, the Court finds by clear and convincing evidence that neither parent has demonstrated that.

63. Both parents have expressed subjectively a willingness to assume custody.

\* \* \*

65. . . . [T]he willingness has to be demonstrated, not only by the words, but by behaviors that would allow the children to return to [Mother's] custody, and her erratic cycling bears upon this willingness. It's not just a subjective willingness, but a demonstrated willingness to be able to assume custody. As the Court previously noted, as late as November and December[29] of 2019 — almost a year after the initiation of this termination of parental rights, [Mother] was still using methamphetamines. There's no indication that there was any follow-up treatment after that relapse, whether it be any additional IOP or detox or anything of that nature.[30] All of these facts are relevant to the determination of willingness to assume custody, which has to be

---

[29] See footnote 25, *supra*.
[30] This finding is not entirely correct. Although Mother did not complete another in-patient treatment program, the proof shows that none was recommended. Instead, Mother was only recommended aftercare, which she intermittently participated in.

- 18 -

demonstrated by behavior and not just by a subjective pronouncement that 'I am ready to receive my children back'.

66. So the Court finds by clear and convincing evidence that the Department has proven that both parents have failed to manifest by act or omission an ability and willingness to personally assume legal and physical custody or financial responsibility for their children.

67. The Court now addresses whether the placing of the children in the parents' care would pose a risk of substantial harm.

* * *

69. With regard to [Mother], the testimony of Mr. Herman regarding her incompetence to parent, and further in view of the continuing use of drugs — including methamphetamine — that placing the children in [Mother's] legal and physical custody would pose a risk of substantial harm to their physical and psychological welfare of the children.

70. The Court also heard testimony that additional failed reunification efforts with [M]other would be detrimental to Jayda and Javon, but especially to Jayda, who had a previous attempt at reunification with [M]other. After her last time in State's custody, Jayda was returned to [M]other and it was not that long before [M]other was overwhelmed again by Jayda's behaviors and was not able to deal with those.

71. The Court does find by clear and convincing evidence that the second prong for this ground for termination has been met.

We begin with the willingness and ability prong. "Ability focuses on the parent's lifestyle and circumstances." *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019) (citing *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018)). "When evaluating willingness, we look for more than mere words." *Id.* (citing *In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018)). "Parents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody. . . ." *Id.* Although we may consider evidence both before and after the petition was filed, *see In re Maya R.*, 2018 WL 1629930 at *7, a parent's ability and willingness may be measured as of the time the petition is filed. *See In re Serenity W.*, 2019 WL 511387, at *7 (citing *In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017)).

We conclude that DCS has proven that Mother has failed to manifest a willingness to assume custody of the children. Here, the evidence shows that after the children came into DCS custody, Mother delayed working on one of the most significant issues in her life—drug addiction. Indeed, despite being offered in-patient drug treatment in the fall of 2018 when she relapsed again, Mother delayed attending until after the termination petition was filed. Moreover, as previously discussed, Mother's efforts even after the termination petition was filed have not been consistent. She chose to use drugs in November 2019 and only intermittently participated in aftercare. She also delayed in responding to many of DCS's requests, such as introducing Boyfriend to Ms. Weeks and removing his mother from her home. On the whole, we must conclude that Mother has made repeated poor choices that she knew would prevent or delay reunification with her children. As such, she has not manifested the willingness to assume custody of them.

The second prong of this ground involves whether the children would suffer substantial harm if returned to her custody. As we have explained regarding this prong:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

In support of her argument that the trial court erred in finding a substantial risk of harm, Mother cites *In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467 (Tenn. Ct. App. Jan. 29, 2021). In *In re Brianna*, a petition to terminate a mother's rights was filed in October 2016. *Id.* at *1. The mother admitted that she had used methamphetamine and marijuana in 2013 and 2014. *Id.* at *7. The mother's fiancé was also involved in methamphetamine use and had been incarcerated for possession with intent to sell from 2014 to March 2017. *Id.* The fiancé, however, had successfully completed drug treatment and was being tested for drug use twice a month. *Id.* Mother also admitted a single marijuana use in Spring 2017. *Id.*

The trial court found that returning the child to the mother's custody would pose a substantial risk of harm, focusing not on the drug use, but on the mother's sporadic visitation. According to this Court, however, "other than the [f]ather testifying to the children's disappointment with [m]other over missing visits and their school sporting events, [the s]tepmother and [f]ather presented no evidence of psychological damage or the risk of psychological harm to [the child]." *Id.* Thus, we held that the petitioners "failed to

- 20 -

prove that there was more than a theoretical possibility of substantial psychological harm from continuing the parent-child relationship[.]" ***Id.***

The same is simply not true in this case. Mr. Herman provided general testimony that "[t]he studies are consistent, that the more changes of placement and the more delays achieving permanency, the more harm." More specifically, while Ms. Turnage testified that it was in Jayda's best interest to be returned to Mother and that, with the right support, Jayda could continue waiting to be reunited with Mother, she admitted that another disrupted placement would be psychologically damaging to Jayda. Even Javon, who was more stable than Jayda, experienced significant anxiety when Mother was not consistent in her efforts to parent him, such as missing visitations. The DCS caseworkers therefore testified, in essence, that if the children were returned to Mother, but later again removed, it would be devastating to their mental health. Thus, it appears likely that another disrupted placement would result in significant psychological harm to the children.

The question then becomes whether the disruption of a future placement is more than a theoretical possibility. We must conclude that it is. Here, there is no question that the children cannot remain in the home where any of its inhabitants is using drugs. Although DCS presented no proof of continuing drug use following the November 2019 relapse,[31] the testimony of DCS workers throughout the case is that Mother often cycles through periods of sobriety and stability followed by periods of drug use and instability. No similar proof was discussed in ***In re Brianna***. *See id.* at *6–7. Mother also admitted at trial that she needed to remove "the wrong people . . . completely out of [her life]" to maintain her sobriety. But she delayed removing Boyfriend's mother from her home for months. It also does not appear that Boyfriend is actively treating his own addiction issues, unlike the fiancé in ***In re Brianna***. *Id.* at *7. And Mother delayed in consistently attending the aftercare that was recommended after her most recent relapse.

Moreover, Mother frankly admitted at trial that one of the triggers for her drug use was "whenever [she is] overwhelmed." The testimony shows that being required to deescalate both children when she visits them together continues to overwhelm Mother, even in the controlled environment of a supervised visit.[32] Thus, it appears that the simple act of allowing Mother to parent both her children places her at greater risk of relapse, which then of course, would result in the removal of the children for the third time. Under these circumstances, we conclude that DCS met its burden to show that substantial harm

---

[31] *See* footnotes 24 and 25, *supra*.

[32] According to Ms. Wright, Mother required help during the unsupervised trial home visit in March 2016 because Mother "struggle[ed] with parenting the[ children]," "ha[d] issues with Jayda's behavior and the children's ability to mind," and "c[ould]n't handle [it.]" Mother disputes this, however—she testified that she did not require help from DCS during the trial home visit because she "could[ not] handle it," but rather because Jayda "was threatening everybody. She was threatening to commit suicide. [So Mother] asked for help from the government." Ms. Turnage also testified that Mother had made significant progress since that time in the supervised visitations, at least with respect to Jayda.

- 21 -

was more than a theoretical possibility if the children are returned to Mother's custody. This ground is therefore affirmed.

## D. Abandonment by Failure to Support

DCS argues that Mother's parental rights should also be terminated on the ground of abandonment by failure to support, pursuant to Tennessee Code Annotated sections 36-1-102(1)(A)(i) and 36-1-113(g)(1). Section 36-1-113(g)(1) states that termination of parental rights may be based upon "[a]bandonment by the parent or guardian, as defined in § 36-1-102." Section 36-1-102(1)(A)(i), in turn, defines "abandonment" as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights . . . , [] the parent or parents . . . have failed . . . to support or have failed to make reasonable payments toward the support of the child[.]

Further,

> "failed to support" or "failed to make reasonable payments toward such child's support" means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period.

Tenn. Code Ann. § 36-1-102(1)(D). In addition, "[a]bandonment may not be repented of by resuming . . . support subsequent to the filing of any petition seeking to terminate parental . . . rights . . . ." Tenn. Code Ann. § 36-1-102(1)(F).

> Under Tennessee Code Annotated section 36-1-102 (1)(I), as amended, it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

"Proving an allegation by a preponderance of the evidence requires a litigant to convince the trier-of-fact that the allegation is more likely true than not true." *McEwen v. Tennessee Dep't of Safety*, 173 S.W.3d 815, 825 (Tenn. Ct. App. 2005) (citing *Austin v. City of Memphis*, 684 S.W.2d 624, 634–35 (Tenn. Ct. App. 1984)).

Here, because the termination petition was filed on January 23, 2019, the relevant four-month period is September 23, 2018 through January 22, 2019.[33] The trial court made the following findings in ruling that DCS proved the ground of abandonment by failure to support as to Mother, in pertinent part:

24. During [the four-month] perio[d], the testimony showed that [Mother did not] suppor[t] the children at all.

25. The Court heard testimony that [M]other later provided certain clothing, toiletry items, games and other things to the children but that was after this four-month period.

\* \* \*

29. The affirmative defense of willfulness has not been proven by the parents.

Respectfully, the evidence in the record does not support these findings. The evidence reflects that Mother provided gifts and other items to the children throughout the custodial episode, including in the four-month period. According to Ms. Turnage's undisputed testimony, Mother attended approximately twenty to twenty-five visits with Jayda at PVH, would bring clothes, toys, and crafts to "[a]lmost every visit," and was "[a]lways making sure that she was checking with Jayda on what [Jayda] needed." Ms. Turnage worked on the case for the entirety of the four-month period. Ms. Weeks, too, was on the case during the entire relevant period. She testified,

[Mother] would bring the[ children] snacks sometimes to visits. I know that she came to one visit and there was a jacket or something that she had on, maybe a hoodie one of the kids wanted, and they wound up leaving with it. She did bring them presents for the holidays. She had -- even when visitation was stopped with Jayda,[34] she had got her -- it was like a little swim skirt that she sent back with me for Jayda.

Furthermore, when Ms. Johnson was asked, "Prior to the coronavirus and the video visits,

---

[33] The trial court states in its order, and Mother states in her brief, that the four-month period is September 23, 2018 through January 23, 2019. However, the relevant period does not include the day the petition was filed. *See* **In re Porcalyn N.**, No. E2020-01501-COA-R3-PT, 2021 WL 2026700, at *4 (Tenn. Ct. App. May 21, 2021) (citing **In re Jacob C.H.**, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014)).

[34] Mother's visits with Jayda were temporarily suspended in July 2018 due to a recommendation from a therapist who worked with Jayda at Omni. It is unclear exactly when the visits resumed, but Ms. Turnage's case recording summaries state that DCS's plan as of August 2018 was to resume family therapy with Mother and Jayda. Even when Mother's visits with Jayda were suspended, however, she continued visiting with Javon.

do you know of [Mother] ever bringing clothing, food, toys for the children?" she answered, "Yes. Yes."

When Mother was asked, "Have you ever purchased any items for your children?" she answered, "Yes. I buy them stuff all the time." And when asked for examples of what she buys for the children, Mother said:

> Clothes, shoes, toys. You know, mostly clothes, shoes, activities. You know, just things that I think they would like; things, you know, just to help take care of them.

> Jayda, she got arts and crafts, she got a new journal, she got clothes. You know, I try to make sure that, you know, she has whatever she needs, socks and underwear, bras, you know. That way, you know, she has her own things, you know, and they don't have to provide it. You know, bathing suits, so she would have one. I mean, you know, hair supplies.

Mother additionally testified, and DCS does not dispute, that from 2018 up until the time she testified, she made at least one hundred visits and phone calls to the children.

DCS does not provide proof that the visits where Mother brought gifts occurred outside of the four-month period. Instead, an affidavit of reasonable efforts executed by Ms. Weeks indicates that visits took place during the relevant time frame. For example, Ms. Weeks testified to a visit that occurred on December 26, 2018, in which Christmas presents were brought for Javon. Indeed, DCS points to no testimony that established that Mother did not visit or provide gifts at all during the four-month period.[35] Based on this evidence, we must conclude that DCS failed to show that Mother did not in fact provide in-kind support for the children throughout this custodial episode, including during the four-month period.

This Court has previously held that support need not be solely monetary, but can include in-kind gifts. *See **In re Kaleb N.F.**,* No. M2012-00881-COA-R3-PT, 2013 WL 1087561, at *23 (Tenn. Ct. App. Mar. 12, 2013). In ***In re Kaleb***, the parent gave the child in-kind support in the form of gifts, clothes, games, and food during the four-month period. *Id.* The child's foster parents did not object to this form of support and never asked that the mother pay monetary support instead. *Id.* And even though the mother's gifts became more sporadic during the four-month period, the mother's consistent gifts in the past were considered as part of the "constellation of facts" in determining whether her alleged non-support was willful. *Id.* This Court therefore reversed the trial court's finding that the failure to support ground had been proven. *Id.* at *24.

---

[35] We note that DCS did not raise as a ground for termination that Mother failed to visit the children in the relevant four-month period.

Although ***In re Kaleb*** was decided under an earlier version of section 36-1-102 in which the burden was on DCS to prove willfulness, we must conclude that the same outcome is required here even under the amended statute. In this case, the evidence generally shows that Mother provided a multitude of gifts for the children, including during the four-month period. Nothing in the record suggests that DCS informed Mother that these gifts were inappropriate or insufficient to qualify as support for the children. *Cf. **id.*** at *23 (citation omitted) ("[A parent's] knowledge of a duty or expectation that [she] provide support . . . is a factor in determining willfulness."). Indeed, the record shows that DCS at times required Mother to bring items to Javon during visits.

We also conclude that Mother's efforts at support were not token given her means. As previously discussed, a parent fails to support a child when his or her efforts are no "more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support refers to support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). This Court has explicitly held that while the burden to prove a lack of willfulness now falls on the parent under section 36-1-102(1)(A), the burden to prove that support is token remains on DCS as the petitioner. *See **In re Josiah T.***, No. E2019-00043-COA-R3-PT, 2019 WL 4862197, at *7 (Tenn. Ct. App. Oct. 2, 2019) (citing ***In re Angela E.***, 303 S.W.3d 240, 250 (Tenn. 2010); Tenn. Code Ann. § 36-1-102(1)(A)(i), (D)) (holding in a case following the amendment to section 36-1-102(1)(A) that "[t]he burden f[alls] on DCS to prove that Mother's payments were 'token support' within the meaning of the statute").

Although willfulness is not explicitly injected into the statutory definition of token support, it appears that we have often treated the two questions—token support and willfulness—as related. *See, e.g.*, ***In re Aden H.***, No. M2017-01453-COA-R3-PT, 2018 WL 3039821, at *7 (Tenn. Ct. App. June 19, 2018) (noting that the father was not willfully failing to secure employment in determining that his payments were not token). In other words, if a parent's ability to provide additional support is limited by factors outside her control, it cannot be determined that her support is merely token. DCS does not argue that Mother's support during the relevant time period was token, choosing instead to rely on the trial court's finding that no support was provided during the four-month period. DCS does argue however, that "Mother appeared to have enough money to purchase drugs through this [four-month] period as she stated she was still abusing methamphetamines in January 2019." The proof indeed shows that Mother was abusing drugs during the relevant four-month period. However, we have previously held that this fact alone is insufficient to show willfulness. *See **In re Addalyne S.***, 556 S.W.3d 774, 788–89 (Tenn. Ct. App. 2018) ("[T]he purchase of illegal drugs alone is insufficient to prove that Mother's failure to provide support was willful."); ***In re Kira G.***, No. 2016-01198-COA-R3-PT, 2017 WL 1395521, at *6 (Tenn. Ct. App. April 18, 2017) ("Although illegal drug abuse and the purchase or sale of illegal drugs may well be relevant to determining whether a parent willfully has failed to support his or her child while supporting his or her drug use, illegal

drug activity by itself does not establish willfulness."). Indeed, the evidence here does not show that Mother purchased illegal drugs during the relevant time frame, but only that she used them.

DCS also concedes in its brief that Mother was unemployed during the four months prior to the filing of the termination petition. Ms. Weeks' testimony indicates that Mother lost her job in February 2018 and did not find another job before she left the case in February 2019. But Mother's own testimony concerning her employment during the four-month period was unclear. At times, Mother testified that she was working during the relevant period and did provide support. At other times, Mother testified that her health issues prevented her from working during that time. Generally, when a parent faces involuntary circumstances that restrict their ability to support their children, such as health problems or disabilities, their failure to support is not willful. *See, e.g.*, **In re Kelsea L.**, No. E2019-00762-COA-R3-PT, 2020 WL 414556, at \*4–5 (Tenn. Ct. App. Jan. 27, 2020), *perm. app. denied* (Tenn. May 13, 2020) (reversing a trial court's finding that a father willfully failed to support his daughter where "he argued at trial that his failure to pay was not willful because he had been injured in a work-related accident, lost his job, and was actively pursuing disability benefits," and "[t]he evidence show[ed] that Father ha[d] been doing odd jobs since he was injured and terminated by his employer, and he [was] barely able to keep his utilities turned on.").

DCS offers little argument concerning the reason for Mother's unemployment. Instead, it merely states that Mother's evidence of her inability to be employed "predated the four-month statutory period," as she referenced events that occurred in the summer of 2018. Of course, unlike events that post-date the relevant period, events that pre-date the relevant period may in fact be relevant to a parent's inability to work. *See generally* **In re Keri C.**, No. E2010-00381-COA-R3-PT, 2010 WL 4739706, at \*16 (Tenn. Ct. App. Nov. 22, 2010) (explaining that the parent's conduct prior to the four-month period is "relevant background and context for the necessarily fact-intensive evaluation" of the parent's conduct during the four-month period).

Here, the evidence tends to show that Mother's unemployment during the relevant time period was the result of issues beyond her control. First, there was no dispute that Mother is the sole caretaker of her own father, who has a host of health issues. But Mother's role as caretaker has not totally prevented her from seeking employment, as she was employed intermittently during the years the children were in DCS custody. Still, Mother herself has suffered from adverse physical and mental health issues throughout the pendency of this case. In particular, Ms. Weeks testified that at the beginning of this case, she encouraged Mother not to focus on seeking employment because she wanted Mother to work on the most pressing issues preventing reunification: Mother's drug and mental health issues. Thus, even in the early days of this case, Mother's mental health appears to have been a barrier to gainful employment.

Mother's physical health was also an issue. Ms. Weeks testified that Mother had a letter from her neurologist stating she was not able to maintain employment "later in the case," but it is unclear from Ms. Weeks' testimony what time period she is referring to. According to Ms. Weeks, Mother had applied for disability when her neurologist recommended she not work, and when the application was denied, Ms. Weeks encouraged Mother to appeal it. Additionally, according to Ms. Weeks' affidavit and testimony, Mother was medically discharged from drug treatment because she was having seizures in August 2018. Ms. Weeks testified that Mother was placed in a medically-induced coma from her seizures and remained in the hospital for "several days, sedated." Ms. Johnson also testified that she and Ms. Wright were at a home visit with Mother when they contacted Emergency Medical Services because Boyfriend indicated that Mother was having a seizure. Mother also testified that she was diagnosed with cancer, for which she has had to undergo surgeries. The record is somewhat inconsistent as to when she was diagnosed, but Ms. Weeks and Ms. Johnson each testified that Mother had informed them of her cancer-related issues.

Thus, the testimony indicates that Mother was often unable to maintain stable employment due to her very real health issues. In light of this evidence, we must conclude that DCS failed to meet its burden to demonstrate that the gifts she provided were token given her means. Therefore, under the totality of the circumstances, we must conclude that Mother did provide in-kind support during the relevant time frame and that DCS consequently failed to prove that Mother abandoned the children by failing to support them.

### E. Abandonment by Failure to Provide a Suitable Home

DCS argues that Mother's parental rights should also be terminated on the ground that she abandoned the children by failing to establish a suitable home. *See* Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102(1)(A)(ii) defines "abandonment" in this context as the following:

(a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

The trial court found that Ms. Weeks' testimony "clearly establishe[d] that four months after Jayda came into custody, [Mother] had not established a suitable home." The trial court found that Mother had also not established a suitable home during the four months after Javon came into custody. In support of its findings, the trial court stated:

41. During mid-2018, [Mother] took [Boyfriend's mother] into her home, knowing that she was a methamphetamine user. Clearly, that weighs upon this issue of whether she had established a suitable home.

42. Ms. Weeks did provide her with opportunities to establish a separate residence, an apartment elsewhere, outside the presence of [Boyfriend's mother] and possibly [Boyfriend]. She also rejected the suggestion that she could separate from [Boyfriend], who was her paramour, in the interest of reunifying her family and having the children back home.[36]

43. There were other issues with the home, not only the drug use in the home, including it being overcrowded and the fact that it was extremely cluttered during this time period.

* * *

45. The Court finds that the Department made reasonable efforts to try to assist [Mother] in establishing a suitable home. They tried to help her get a job, find separate housing, and tried to get a bus ticket for [Boyfriend's mother] back to her home but [Mother] rejected those.

---

[36] As explained *supra*, DCS's position throughout the case on Boyfriend's cohabitation with Mother is unclear from the record.

There is no dispute that the conditions in subsections (a) and (b) are satisfied here: the children were removed by the juvenile court dependency and neglect orders and put in DCS custody, and during the dependency and neglect proceedings, the juvenile court found that reasonable efforts were either made by DCS or were reasonably not made due to the emergency nature of the removal.

As for the third condition, because Jayda was removed on May 15, 2017, the four-month period following her removal is May 16, 2017 to September 15, 2017. Javon was removed on March 16, 2018, so the relevant four-month period for him is March 17, 2018 to July 16, 2018.[37] DCS argues that it made reasonable efforts during the immediate four months after Jayda and Javon were removed, as well as during other periods after the children were removed. We will focus on whether DCS made reasonable efforts to assist Mother in establishing a suitable home during the four months immediately after Javon was removed, with respect to both children, because the case law allows for examination of any four-month period following the removal. *See In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016) ("As long as the proof relates to "a period of four (4) months following the removal," Tenn. Code Ann. § 36-1-102(1)(A)(ii), the ground may be established. The statute *does not* limit the court's inquiry to a period of four months *immediately* following the removal."). Additionally, Jayda entered custody in large part due to her own behavioral issues, not necessarily because Mother's home was not suitable, and we therefore find the proof regarding DCS's efforts in the first four months following Jayda's removal largely irrelevant.

Ms. Weeks' efforts during the four-month period included the following: she maintained consistent contact with Mother; provided Mother with calendars of her appointments; sometimes reminded Mother of appointments; offered Mother transportation twice; communicated with Mr. Herman's office; offered Mother eight visits with one or both of the children and three phone calls with Jayda; advised Mother repeatedly to focus on her alcohol and drug treatment; communicated with Bradford, an addiction treatment facility; called Mother into a CFTM at Mother's request; administered at least two drug screens and advised Mother to return to Bradford when Mother relapsed; rescheduled a missed appointment with Mr. Herman; scheduled an appointment with Bradford; discussed with Mother that she would be filing for termination; provided Mother the number for Lifecare Family Services so Mother could receive therapy; provided Mother the phone number for a neurologist; and sent Mother a copy of her attorney's business card.

As for Mother's efforts during the first four months after Javon's removal, according to Ms. Weeks' affidavit of reasonable efforts, Mother appears to have attended at least six

---

[37] The trial court states that "[f]or Jayda, the relevant period would be from May 15, 2017 to September 15, 2017. For Javon, the relevant period would be from March 16, 2018 to July 16, 2018." That is incorrect, as the four-month period begins the date after the child was removed. *See, e.g.*, *In re Navada N.*, 498 S.W.3d at 595–96.

visits, an appointment Javon had at Lifecare, at least one CFTM via phone, and what appears to have been a meeting regarding Jayda's Individualized Education Program; passed a drug screen; and started treatment at Bradford at least twice. Mother also attended an appointment with Mr. Herman. However, also according to Ms. Weeks, Mother arrived late and/or left early for four visits, missed two visits with Javon, and missed three phone calls with Jayda; Mother had at least one positive drug screen; the Bradford staff told Ms. Weeks that Mother had multiple absences; and Mother missed an appointment with Mr. Herman. Additionally, according to the juvenile court's adjudication and final disposition hearing order on Javon, Mother was served and failed to appear for a hearing on May 24, 2018.

Considering all of this, we conclude that during the four months immediately after Javon was removed, DCS made reasonable efforts to assist Mother in establishing a suitable home for the children, and that those efforts outweighed Mother's. When compared to Ms. Weeks' efforts to help Mother attend her appointments and seek drug treatment, Mother's efforts were less than reciprocal. This element of the abandonment by failure to establish a suitable home ground was therefore met.

Finally, we must determine if DCS has shown by clear and convincing evidence that Mother has demonstrated a lack of concern for the children such that it appears unlikely that she will be able to provide a suitable home for them at an early date. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). "As to this portion of the analysis, the court 'may consider the parents' more recent behavior.'" **In re Billy T.W.**, No. E2016-02298-COA-R3-PT, 2017 WL 4317656, at *9 (Tenn. Ct. App. Sept. 27, 2017) (quoting **In re Kayla B.**, No. E2016-01192-COA-R3-PT, 2017 WL 438622, at *7 (Tenn. Ct. App. Feb. 1, 2017) (citing **In re Joshua S.**, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *18 (Tenn. Ct. App. June 16, 2011))). Here, DCS's brief asserts that only two issues prevent Mother's home from being suitable: "drug use and the number of people living there."

We begin with the physical environment of Mother's home. Throughout the pendency of this case, Mother lived with her father in order to help him with his health problems. A DCS inspection of the home early in this custodial episode found it cluttered and with a hole in the porch. But DCS concedes in its brief that these physical issues could be remedied. Indeed, it appears that the clutter was in fact remedied by Mother and Boyfriend by the spring or summer of 2019 (it is not entirely clear from the testimony), and there was no testimony that the porch issue alone made the home unsafe or that it had not been remedied. And DCS does not assert in its brief that these issues demonstrate that Mother's home is unsuitable.

DCS is correct that the house was also overcrowded. For some time, Mother, Mother's father, Boyfriend, and Boyfriend's mother lived in the three-bedroom home. This meant that the only bedroom where the children could reside was occupied by a third person. But Mother testified, and the trial court appeared to credit, that she had removed

Boyfriend's mother from the home around June 2020.[38] Nothing in DCS's brief suggests that the overcrowding remained an issue following this person's removal. Still, Mother's delay in improving this issue demonstrates at least some lack of concern for the necessary reunification steps.

The physical environment of Mother's home, however, is not the only consideration. Instead, "[a] suitable home 'requires more than a proper physical living location. It requires that the home be free of drugs and domestic violence.'" *In re Navada N.*, 498 S.W.3d at 595 (citations omitted) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)).

As discussed in detail throughout this Opinion, Mother had significant drug issues throughout the pendency of this case. The evidence shows that Mother had been clean for a period of many months by the conclusion of proof at the termination trial.[39] Mother tested negative for drugs in May 2020, and both she and Boyfriend, the only individuals remaining in the home with drug issues, tested negative in June 2020. While there can be no dispute that Mother was currently sober when proof concluded at the termination trial, we have concerns that this sobriety will be lasting, as we have explained, given Mother's history. In particular, Mother failed a drug test in November 2019, many months after the termination petition was filed and after having completed at least some form of drug treatment. This is compelling evidence of a lack of concern for the children to the extent that it appears unlikely that she will be able to provide a suitable home for them at an early date.

Mother relies in part on *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387 (Tenn. Ct. App. Feb. 8, 2019), in arguing that her more recent behavior, rather than her prior drug use, is the more relevant consideration in determining whether she has demonstrated the requisite lack of concern. In *In re Serenity W.*, the parent had been sober for only four months by the time of trial and had previously relapsed, including after the termination petition was filed. *Id.* at *2, 5. Still, the parent was actively participating in treatment by the time of trial and her current sobriety was the longest period of sobriety she had ever achieved. *Id.* at *2–3. We held that under these circumstances the ground of abandonment by failure to establish a suitable home was not proven, without any explicit

---

[38] As previously discussed, Mother delayed removing Boyfriend's mother from the home. We must note, however, that some of DCS's efforts to remove this woman from Mother's life were not entirely reasonable. For example, DCS wanted Mother to move miles away from her father, who she was undisputedly taking care of. DCS also attempted to place the 67-year old ill woman on a solo bus ride across the county. Still, we again note that Mother was able to remove this woman from her home at the eleventh hour, demonstrating that Mother did have some control over the situation.

[39] DCS asserts that Mother demonstrated "at most four months of sobriety" by the time of trial, which appears to count Mother's February 2020 drug test as proof of ongoing drug use. However, Mother appears to have actually demonstrated sobriety for approximately six to seven months, at least. *See* footnotes 24 and 25, *supra*.

discussion of how the risk of relapse affected this ground. *Id.* at \*5. The risk of relapse was discussed, however, in other parts of the *In re Serenity W.* For example, with regard to best interest, we noted that the parent "could relapse; she has done so before." *Id.* at \*8. Still, we held that DCS presented no proof that a relapse was anything more than a theoretical possibility. *Id.* at \*7.

In this case, however, we have already concluded that Mother's history of relapsing and not timely remedying barriers to reunification is sufficient proof that conditions preventing the children from returning to her care remain and that lasting improvement at an early date is unlikely. Moreover, we have concluded that there is more than a theoretical possibility of relapse if the children are returned to Mother, as discussed *supra*. Additionally, even though Mother has made admirable progress in both her sobriety and the physical environment of her home, at least to the same extent as the parent in *In re Serenity W.*, the proof shows that much of her improvements came after months of voluntary delays. For example, Mother delayed removing Boyfriend's mother from her home and delayed consistently attending aftercare. Mother also chose to engage in criminal activity that put her at risk of incarceration. These voluntary actions are proof that Mother has exhibited a lack of concern for the children that continues to delay reunification. This ground is therefore affirmed. *But see In re Quintin S.*, 2017 WL 2984193 (affirming the ground of persistent conditions but holding that DCS failed to present clear and convincing proof of a lack of concern to such a degree that it was unlikely the mother could provide a suitable home at an early date, because even though she had tested positive for drugs multiple times after the termination petition was filed—including almost one year after the petition was filed—she had been sober for a period of six months by the time of trial, planned to pay her fines and court costs imminently to regain her driver's license, had suitable employment, and was living in a proper physical home environment as of approximately five months after the termination petition was filed).

## II. Best Interest

Because we have determined that at least one statutory ground has been proven for terminating Mother's parental rights, we must now decide if DCS has proven, by clear and convincing evidence, that termination of Mother's rights is in the children's best interests. Tenn. Code Ann. § 36-1-113(c)(2); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). If "the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Navada N.*, 498 S.W.3d at 607.

The statutory factors that courts should consider in ascertaining the best interest of the children include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).[40] "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005) (citations omitted).

---

[40] This is the version of section 36-1-113(i) that was in effect when the termination petition was filed. The Tennessee General Assembly amended the statutory best interest factors in 2021. *See* 2021 Tenn. Laws Pub. Ch. 190 (S.B. 205), eff. April 22, 2021. Neither party asserts that the revised version of the statute is applicable in this case.

In finding that termination of Mother's parental rights is in the children's best interest, the trial court made the following findings, which have been renumbered to correspond with the above factors:

(1) [Mother] has not made such an adjustment of circumstances. The proof shows that [Mother] could make, and has made in the past, temporary adjustments of circumstances. These would be followed by another cycle of spinning down into a cycle of drug abuse and mental health issues. The Court again notes the most recent relapse being some time at least November or December[41] and still testing positive for methamphetamines in February.[42] That is not the kind of lasting adjustment that this Court could say would show that it would be in the best interests of these children to return to her care. Based upon the proof, the court finds that this factor weighs against [Mother].

(2) With regard to [Mother], the question really is whether it can be a lasting adjustment. She has made, on occasion, temporary adjustments. In fact, adjustments and changes in her behavior have led even the guardian ad litem to be supportive of her effort to regain custody. This changed because of the last relapse, the last drug use, and the last positive test for methamphetamine. The Court does find that the Department has made reasonable efforts as to [Mother] for the duration of time.

(3) [Mother] has made some pretty extraordinary efforts to visit with Jayda at Parkridge Hospital in the Chattanooga area. Going back to whether reasonable efforts were provided, she's been assisted in that by the Department as well. There have been times, however, when she was in a cycle of active drug use, that she did not want to go. She candidly testified to that. She did not want Jayda to see her in that condition. So there have been intermittent pauses in her visitation with Jayda.

(4) [This factor] does not weigh so heavily against [Mother] because when she has been able and functioning well and not abusing drugs, she has made some pretty extraordinary efforts to visit Jayda and maintain contact with Javon.

(5) [T]he Court did hear from psychologists and counselors in Jayda's institutional setting regarding what would be the likely result of a change in caretakers. It's not just a change of caretaker, the significant issue is the physical environment. The Court has not heard any indication that Jayda is

---

[41] *See* footnote 25, *supra.*
[42] *See* footnote 24, *supra.*

ready to exit that environment, but it cannot be helpful to her to languish, or to Javon to languish, in the foster care system or in an institutional setting for this period of time. The Court believes there is little chance that the children could return to either parent in the near future. The change in physical environment might be particularly jarring for Jayda and impact her emotional, psychological, and mental condition, especially if that meant coming back to [Mother's] home where there has been an inconsistent and erratic pattern of drug use and mental health challenges within [Mother's] home.

(6) The Court does not have proof of this factor for either parent.

(7) At present, at least according to the most recent testimony, [Mother] professes to be clean, at least since her most recent relapse; and she also testified that the drug supplier in her immediate neighborhood upon who she, [Boyfriend], and [Boyfriend's mother] had relied, has removed himself from their immediate vicinity. That does alleviate some concern in that respect. Still, the consistent pattern of cycling does cause the Court concern about whether there might be criminal activity in the nature of continued drug use in [Mother's] home, and that would satisfy the use of controlled substances that might render her unable to care for the children. On this factor, the Court finds that the recent testimony is more positive to [Mother]. This factor does not weigh so heavily against her more recently in terms of her testimony, unfortunately the Court has to ask how long that will last.

(8) The Court does have proof via the analysis and evaluation of Scott Herman that, at least in terms of his first assessment, that there are mental and emotional status issues with [Mother] that would prevent her from effectively providing safe and stable care. This was not just involving active drug use but also involved mental health issues which he thought were quite severe. These issues had caused her to feel overwhelmed to the point that she had taken Jayda and left her at the DCS office. The Court finds that there has been a lack of proof that [Mother] has sufficiently addressed these mental and emotional status issues that have caused her in the past to feel extremely overwhelmed, especially with such a challenging child in Jayda, and with Javon who feeds off Jayda and becomes embroiled in the same behavioral patterns.

(9) [Mother] has provided some support for the children when she has been employed. That has been deducted and applied to her child support. She has provided items of toys, toiletries, and other things that the children might like during this period of time. This factor . . . does not weigh against [Mother], at least in terms of the period of time since the filing of this petition. She has

made efforts to provide some support for these children. Whether it is strictly consistent with the guidelines, the Court cannot determine.

The court then went on to state,

The more difficult question is whether the best interest analysis supports the termination of [Mother's] parental rights. . . . But considering all of these factors, the bond issue is very substantial, and the Court wants to give that factor sufficient weight. But when all of these factors are weighed in a holistic way, the Court finds that it is in the best interest of the children that [Mother's] parental rights be terminated. This is because of the erratic and sporadic cycling. The testimony in this case established pretty clearly that [M]other failed to address her issues over long periods of time. Not only after the children came into custody but after the filing of the termination petition where these things continued to happen again and again. In view of the cyclical nature of [Mother's] difficulties in her cycling into a bad period, the repeated attempts at rehabilitation and subsequent relapse, in view of her inability or disinclination to remove a known drug user from the home when she knew for at least a year and a half that it was going to be a hurdle and a barrier to her regaining custody, the Court finds [M]other has not demonstrated that it is in the best interest of these children to risk it at this point. The Court finds that it would absolutely be risking these children's best interest if [Mother's] parental rights were not terminated.

The children have been subjected to an uncertainty of lingering in the foster care system and, in an institutional setting with regard to Jayda, for a substantial period of time. And we come back to square one after this amount of time and are only now attempting to do anything with regard to the removal of [Boyfriend's mother] and the fairly recent — during the pendency of the hearings in this case[43] — relapse with methamphetamine. The Court will not risk this. It is in the children's best interest, by clear and convincing evidence, that [Mother's] parental rights be terminated and that the children be made available for adoption.

The proof showed that even a child with Jayda's significant mental health challenges and issues can be, once termination is effected, made available for adoption and transitioned into a permanent home. This would give her and Javon stability. They need that stability and they need to no longer languish in uncertainty in an institutional setting for Jayda and in a foster setting for Javon, without hope of that kind of permanency and long-term relationship

---

[43] We note again that Mother's most recent relapse, of which there is definitive proof, was in November 2019, before the trial began in this case. *See* footnotes 24 and 25, *supra.*

and care.

We will now review each best interest factor in turn. As to the first factor, Mother appears to have effected a change of circumstances—she is seeking mental health treatment, she has been clean from drugs likely since November 2019, and she has removed Boyfriend's mother from her home. *See* Tenn. Code Ann. § 36-1-113(i)(1). However, the question, as we have explained, is whether this change will be lasting, primarily because of Mother's history of progress followed by relapse. Therefore, this factor weighs heavily in favor of termination.

The second factor involves much of the same analysis. DCS provided reasonable efforts at least during the four months immediately following Javon's removal and even beyond. *See* Tenn. Code Ann. § 36-1-113(i)(2). The reasonableness of some of DCS's efforts, however, is questionable, like offering to send Boyfriend's mother out of state on a bus and offering Mother an apartment somewhat far away from her ill father. Regardless, the same concern arises under this factor as with the first—whether Mother's adjustment will be lasting. Therefore, this factor, too, weighs fairly strongly in favor of termination.

On the third factor, Mother visited and called the children throughout the pendency of this case. *See* Tenn. Code Ann. § 36-1-113(i)(3). Granted, sometimes she was more consistent than others, and when she was inconsistent, it would cause the children distress. For example, it appears that Mother was sometimes so late for her visitation that it would cause Javon extreme distress and the visitation framework had to be modified. However, she testified that when she would miss visits or calls with Jayda, it was not because she did not want to visit, but because she did not want Jayda to see her when she was not doing well. Obviously, the reasons Mother was not doing well were tied to her own drug addiction. But we have recognized that "parents with drug addictions can 'have false starts and set backs, as well as successes and, regrettably, backsliding,' and we should take that into account." ***In re Serenity W.***, 2019 WL 511387, at *6 (quoting ***In re M.J.M., Jr.***, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *11 (Tenn. Ct. App. Apr. 14, 2005)), *overruled on other grounds by* ***In re Kaliyah S.***, 455 S.W.3d 533 (Tenn. 2015). The trial court noted both the evidence in favor of Mother and against her with regard to this factor, but declined to state whether this factor weighed for or against termination. Still, the trial court noted that Mother had made "extraordinary" efforts to visit Jayda during some parts of this case. And Mother's visitation consistency increased in the latter part of the case. As such, we conclude that this factor weighs slightly against termination in this case.

As to the fourth factor, the trial court found that the bond between Mother and the children is "very substantial." *See* Tenn. Code Ann. § 36-1-113(i)(4). We agree. Here, there can be absolutely no dispute that Mother and the children have a very close and meaningful bond. Even DCS concedes that "[t]he children are bonded with Mother and would prefer to return to her custody." Ms. Turnage also testified to the significant bond between Mother and Jayda and the "tremendous progress" she saw Mother and Jayda make, both

individually and in their relationship. As such, this factor weighs heavily against termination.

With respect to factor five and whether a change of caretakers and physical environment would negatively affect the children, the question is more difficult. *See* Tenn. Code Ann. § 36-1-113(i)(5). Although the trial court found that it had "not heard any indication that Jayda is ready to exit [PVH]," we cannot conclude that the evidence supports that finding. While Ms. Weeks testified that "it [was her] knowledge that the [children] are not currently in adoptive placements," Ms. Turnage testified that Jayda was ready and needed to leave PVH, regardless of whether Mother's rights were terminated, because she was regressing being in an institutional setting. Thus, the evidence shows that Jayda is ready to exit the institutionalized environment of PVH.

As a result, it appears that in order to achieve any type of permanence, both children will be required to change caretakers and physical environment, regardless of the outcome of this appeal.[44] The question then is whether a change in caretakers to Mother would be more detrimental to the children than a change in caretakers to relative strangers. On this question, Ms. Turnage testified that it is in Jayda's best interest for Mother's parental rights not to be terminated, even though Jayda will remain in DCS custody for the time-being. She said that if Mother's parental rights are terminated, "[that] would be detrimental to [Jayda]," meaning that she "would anticipate regression in [Jayda's] behaviors and her mood and her overall well-being." She also testified that with the right support, Jayda can wait longer to return to Mother's home while Mother continues to work on resolving her issues. In other words, even if reunification with Mother is delayed, even by a period of six months due to a relapse by Mother, waiting on the possibility of reunification was still better for Jayda than the alternative. And while there was little testimony directed toward Javon, the evidence shows that he is highly bonded with his sister and would be best placed with her. Even DCS concedes that "the children are extremely bonded with one another" and separating them would be detrimental.

Of course, Mother's inability to effect a lasting change in her drug addiction is highly relevant to this question. Ms. Turnage acknowledged the importance of Mother being stable and clean to any attempts at reunification. While Mother has made substantial progress, we have concluded that a relapse is more than a theoretical possibility. Thus, delaying the children's permanency in the hopes that Mother can remain clean involves more than a little uncertainty.

But the possibility of a permanent placement for both children outside of Mother's care is almost equally as uncertain. There was testimony about the steps that DCS could

---

[44] As explained *supra*, Javon's foster parent may no longer be willing to adopt him. In any event, his foster parent likely cannot adopt both of the children, and given that the children should remain together, his foster home does not appear to be a permanent option.

- 38 -

take to find adoptive homes for the children throughout the United States if full guardianship was awarded. These steps include placing the children on national websites in hopes of finding placements. There was also testimony that DCS had found a potential placement for Jayda. However, they were still in the introductory phase and would have to see how Jayda's placement went before evaluating whether the family could also take Javon, and Jayda has a history of unsuccessful foster care placements. Thus, the hope that the children could be placed in a permanent home together in the near future appears to also involve more than a little uncertainty.

This case therefore presents a unique factual scenario. On the one hand, we have a parent whose history of relapses gives us concern as to her ability to effect a lasting change. But on the other hand, we have at least one child whose already precarious mental health will be extremely harmed if the parent-child relationship is terminated, particularly if Mother continues on her path of sobriety. Moreover, the child's counselor explicitly testified that reunification with Mother is in the child's best interest if Mother is continuing to work through her issues, even if that reunification is delayed by a period of many months. As to the other child, his best interests are best served by reunification with his sister, and also having the opportunity to maintain his significant bond with Mother. And the possibility of permanence for both children in another home is uncertain. Under these circumstances, we must conclude that factor five favors Mother.

The trial court found that no evidence was presented as to factor six, regarding abuse or neglect perpetrated against the children. *See* Tenn. Code Ann. § 36-1-113(i)(6). DCS offers no argument as to this factor. We therefore agree that it favors Mother. *See **In re Taylor B.W.***, 397 S.W.3d 105, 113 (Tenn. 2013) (affirming the trial court's holding that the absence of proof as to a factor meant the factor did not favor termination); ***In re Malachi M.***, No. E2020-00561-COA-R3-PT, 2020 WL 6819195, at *9 (Tenn. Ct. App. Nov. 20, 2020) (holding that the lack of evidence to a factor meant the factor "weigh[ed] against terminating Father's parental rights").

On factor seven, all indications are that the physical environment of Mother's home is currently healthy and safe, there is not criminal activity happening there, and there is no use of illicit substances. *See* Tenn. Code Ann. § 36-1-113(i)(7). Again, though, we are unsure if this will remain the case, given Mother's history of difficulty with maintaining sobriety and her delay in removing Boyfriend's mother from the home. We are also troubled by the fact that Boyfriend does not seem to currently be receiving drug treatment, though there is conflicting testimony regarding why, and there is no proof that he used drugs after November 2019. In fact, he passed a drug test in June 2020, and according to Mother's testimony, Boyfriend was not continuing to use drugs. Given our concerns about potential repetition of drug-related issues, however, this factor weighs slightly in favor of termination.

Next, we consider factor eight: Whether the parent's mental and/or emotional status would be detrimental to the child or prevent the parent from effectively providing safe and stable care and supervision for the child. *See* Tenn. Code Ann. § 36-1-113(i)(8). DCS makes a passing reference to Mother's drug use with respect to this factor. As we explained when we analyzed the mental incompetence ground, DCS points to no authority for the proposition that drug addiction alone is sufficient to render a parent mentally incompetent to care for her children. DCS instead mainly relies on Mr. Herman's testimony and reports in support of its argument that this factor favors termination. As we have explained, however, the proof offered through Mr. Herman is not sufficient proof that Mother's mental and/or emotional status is detrimental to the children or otherwise prevents her from caring for them. We acknowledge that in our analysis of some of the grounds for termination, we considered it important that, when the children are together, Mother cannot deescalate their behavioral issues. However, this may have more to do with the children's behavioral issues than Mother's mental status. Still, the proof shows that Jayda and Mother seem to mirror each other in terms of their well-being: when Mother is doing well, Jayda does well, but Mother's setbacks cause Jayda setbacks. Thus, Mother's mental and emotional setbacks can be detrimental to Jayda at times. But DCS presented no proof that Mother had recently suffered from such a setback. Moreover, DCS bears the burden in the best interest analysis, and on this factor, DCS relied primarily on Mr. Herman's conclusions as proof. Again, the proof offered through Mr. Herman is simply insufficient to show that Mother's mental status prevents her from being able to parent capably. Therefore, this ground is essentially neutral.

Finally, we consider whether Mother provided support consistent with the Child Support Guidelines. *See* Tenn. Code Ann. § 36-1-113(i)(9). The trial court noted that no proof was provided as to the application of the guidelines. DCS offers no argument that this factor favors termination. So we conclude that it weighs against termination. *See In re Taylor B.W.*, 397 S.W.3d at 113; *In re Malachi M.*, 2020 WL 6819195, at *9.

In sum, while three factors weigh fairly heavily in favor of termination in this case, six factors, to varying degrees, do not weigh in favor of termination. As this Court has explained, however,

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005) (citation omitted). Thus, while more factors lean against termination in this case, we must conclude that the question of best interest constitutes a very close case.

In its order, the trial court "note[d] that this case is probably one of the most complicated and difficult termination of parental rights cases that this judge has ever encountered." We agree that this is a complicated and difficult case. When children have been in the care of DCS for years and their parents still have not managed to make progress, typically the law favors termination. *See, e.g.*, *In re L.S.W.*, No. M2000-01935-COA-R3-JV, 2001 WL 1013079, at *8 (Tenn. Ct. App. Sept. 6, 2001) ("This mother . . . has shown that she is simply unable to overcome her dependency on drugs and alcohol or to make improvements in her living conditions or her ability to parent her children. Three years passed between the time DCS became involved with the mother and the termination hearing. . . . The children need stability in their lives, and the mother has proved herself unable to provide that stability. To do other than affirm the termination of parental rights would leave these children 'in limbo' indefinitely, and we cannot agree that long-term foster care is in the children's best interest.").

Like the parent in *In re L.S.W.*, Mother's inability to maintain her sobriety long-term is clearly an issue in this case. We recognize that we have held that there is more than a theoretical possibility of substantial harm if the children are returned to Mother's care, given her potential to relapse. The purpose of the best interest analysis is not, however, to punish a parent for their wrongdoing, as "[n]ot all parental misconduct is irredeemable." *Moody*, 171 S.W.3d at 193. Thus, Tennessee law recognizes "the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Audrey S.*, 182 S.W.3d at 877. As such, a child's best interests is "viewed from the child's, rather than the parent's, perspective." *Id.* at 878. Viewing the best interest question through this lens, the importance of other factors comes into sharper focus.

Critically, the existence of a meaningful relationship often strongly weighs against termination. Indeed, "[t]his Court has held that both the existence of a meaningful relationship and the lack of meaningful relationship may be considered important factors in the best interest analysis." *In re P.G.*, No. M2017-02291-COA-R3-PT, 2018 WL 3954327, at *16 (Tenn. Ct. App. Aug. 17, 2018) (citing *In re Addalyne S.*, 556 S.W.3d 774, 795 (Tenn. Ct. App. 2018)); *see In re Jayvien O.*, No. W2015-02268-COA-R3-PT, 2016 WL 3268683, at *9 (Tenn. Ct. App. June 7, 2016) (affirming a trial court's holding that termination was in the child's best interest where the trial court found that "'most importantly,' . . . a meaningful relationship had not been established between" the mother and child); *In re Terry S.C.*, No. M2013-02381-COA-R3-PT, 2014 WL 3808911, at *18 (holding that termination was in the children's best interest including because, "perhaps most importantly, [the mother] has failed to maintain regular visitation with the children and therefore has no meaningful relationship with them").

Thus, even in "close cases," we have held that termination of a parent's rights is unwarranted where the parent has a meaningful relationship with the children. For example, in *In re Addalyne S.*, the child had been raised by her grandparents since birth in a stable, loving home, the father had failed to provide financial support since the termination petition was filed, he had a "long history of drug abuse and brief periods of incarceration prior to trial," he had choked the mother when she tried to wake him after he passed out from drug use, and he failed a drug test approximately three months before trial. 556 S.W.3d at 793–94. Still, we held that termination was not in the child's best interest because of the meaningful relationship between the father and child. *See id.* at 795–96. We noted that "[i]n a similarly 'close case' this Court [] held that allowing the parent to continue a relationship with the child supported denying termination of parental rights even where the children were in a loving pre-adoptive home and questions remained as to whether the parent could effectively parent the child." *Id.* at 796 (citing *In re Liam S.*, No. E2016-02461-COA-R3-PT, 2017 WL 4422342, at *11 (Tenn. Ct. App. Oct. 4, 2017)).

The bond between Mother and her children in this case is extremely and indisputably close. Of course, a meaningful relationship alone is not sufficient to show that a child's best interests are served by continuing the parent-child relationship. *See In re Briana H.*, No. M2017-02296-COA-R3-PT, 2018 WL 4191227, at *14 (Tenn. Ct. App. Aug. 31, 2018) ("The existence of a meaningful relationship between the parent and the child, however, does not . . . foreclose the possibility that termination is in the child's best interests[.]"). This is particularly true when a child has been in DCS custody for a long period of time waiting for a parent to make consistent enough progress to allow reunification. *See, e.g.*, *In re Renaldo M.*, No. M2016-00472-COA-R3-PT, 2017 WL 1041541, at *5, 9 (Tenn. Ct. App. Feb. 7, 2017), *perm. app. denied* (Tenn. Feb. 7, 2017) (holding that termination was in the children's best interest when they had been in custody for many years, even though the parent "ha[d] made a genuine effort to establish a meaningful relationship with [the children]"); *In re Holly B.C.*, No. E2012-00362-COA-R3-PT, 2012 WL 6727609, at *12 (Tenn. Ct. App. Dec. 27, 2012) (affirming termination in spite of evidence that the children had a relationship with their parents when the evidence showed the child had been in DCS custody for four years and the parents had not made lasting progress).

What sets this case apart from other cases, however, is primarily the expert testimony provided by Ms. Turnage. According to Ms. Turnage, severing the bond between Mother and Jayda would be detrimental to Jayda's already precarious mental health. And Ms. Turnage testified that even if Mother had a relapse, which she undisputedly did in this case, her opinion that Jayda and Mother's bond should not be severed did not change, so long as Mother worked to again achieve sobriety. While no similar expert proof was presented as to Javon, there can be no dispute that he is also strongly bonded to Mother and to Jayda. Thus, while this factor may not be dispositive in all cases, the unique facts of this case mandate that we give particular weight to the meaningful relationship that exists here.

In this respect, this case is somewhat similar to ***In re C.M.S.***, No. W2004-00295-COA-R3-PT, 2004 WL 2715331 (Tenn. Ct. App. Nov. 19, 2004). As in this case, the ground of persistent conditions was affirmed in ***In re C.M.S.***: the child had been in DCS custody for nearly six years at the time of trial with little improvement in the mother's living situation. ***Id.*** at *4, 6. But the proof also showed that the child suffered from a mental disability with an approximate IQ of forty-nine (49) and that she showed "fulfillment and joy" during regular visits with the mother and her siblings. ***Id.*** at *1, 7. We also expressed concern that "the psychological effects of a permanent severance of the Mother/child relationship on this child have not been fully explored." ***Id.*** at *8. Therefore, in the best interest analysis, we refused to "overlook the possible effect" on the child if the mother's parental rights were terminated. Instead, we concluded that "[w]ithout further evidence as to what effect the severing of the bond with Mother and half-brother will have, we cannot say that it is in [the child's] best interest to take these relationships away from her." ***Id.***

We concede that the child in ***In re C.M.S.*** suffered far more profound challenges than the children in this case. But unlike in ***In re C.M.S.***, the effect of severing Mother's relationship with Jayda was "fully explored" in this case. ***Id.*** In fact, Ms. Turnage's largely unchallenged testimony is that if Mother continues in her progress, Jayda would be more harmed by the severance of her relationship with Mother than a delay in permanency, to the extent that permanency is even on the horizon, as discussed further *infra*. And while Javon does not suffer the same challenges as his sister, the evidence generally shows that removing Mother and Jayda from his life would negatively affect him and that he has little better prospects of adoption in the immediate future.

Additionally, it appears that Mother has worked to achieve the current sobriety that Ms. Turnage testified was necessary to keep reunification as an option. While we remain concerned that Mother will be able to maintain her sobriety, there can be no dispute that she did make significant progress in improving her home and sobriety in at least approximately the last six to seven months before the close of proof. It is true that Mother's most recent progress came after the filing of the termination petition, but it must be noted that this case is not typical, as the proof alone took over seven months to present. Indeed, the time between the filing of the petition and the trial court's oral ruling was over eighteen months. Nothing in the record indicates that this delay was the result of contumacious conduct by Mother. Due to the delay, Mother had a significant period of time to demonstrate improvements between the filing of the petition and the end of the termination trial. "Lacking a crystal ball, we cannot be sure that Mother's positive changes will last." ***In re Serenity W.***, 2019 WL 511387, at *9 (internal citation omitted) (citing ***In re C.B.W.***, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *8 (Tenn. Ct. App. June 26, 2006)). But we cannot totally discount Mother's more recent, yet months-long positive efforts, as that "is precisely how the system is designed to function"—to help parents make positive adjustments. ***In re Gabriella D.***, 531 S.W.3d 662, 686 (Tenn. 2017).

While we agree Mother may not be able to presently assume custody of the children, this fact must be considered as merely part of the constellation of factors analyzed in determining a child's best interest, which is unique to each individual case. *Id.* at 682 ("[T]he facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.") (internal citation omitted); *see also* Tenn. Code Ann. § 36-1-113(i) (stating that courts are "not limited" to considering only the factors listed in the statute when analyzing best interest). Thus, the fact that a parent cannot presently assume custody has not always resulted in a finding that termination is in the child's best interest. *See, e.g.*, *In re C.M.S.*, 2004 WL 2715331, at *8 (holding that while termination was not presently in the child's best interest, the court "does not conclude that [the child] should be removed from her current foster home to [the mother's] custody"). And there were no delusions at trial that even if the petition to terminate Mother's parental rights was denied, custody would not be immediately returned to her. *See In re C.B.W.*, 2006 WL 1749534, at *8 ("Denying a petition to terminate . . . does not, however, result in an automatic return of the children to the parent's custody.").

The issue of the children's long-term custody is important here. In particular, we note that the prospect of finding a permanent adoptive home for the children together is also somewhat speculative. Testimony from DCS was that neither child was in a confirmed pre-adoptive home and that it may take a nationwide search using something akin to a dating website to find adoptive homes for the children.[45] While, again, Mother may not be able to presently assume custody, terminating Mother's parental rights may therefore "accomplish nothing other than setting [the children] adrift with no adoptive family." *In re Kendra P.*, No. E2015-02429-COA-R3-PT, 2016 WL 4065491, at *11 (Tenn. Ct. App. July 28, 2016). Such a scenario would likely harm any child, let alone the children in this case, where there is the added expert proof that at least Jayda will be harmed if Mother is removed from her life. Under somewhat similar circumstances, we held that to deprive a child experiencing mental challenges "of her only natural family relationships, without any evidence of adoption prospects, may not be in her best interest." *In re C.M.S.*, 2004 WL 2715331, at *8. Thus, with little prospect of adoption and Ms. Turnage's clear testimony, there is proof that the children are equally likely to suffer harm if Mother's parental rights are terminated as they would be if her parental rights are not terminated, especially if she continues on the track she has been on with her sobriety.

---

[45] For example, Ms. Weeks testified that this search entails having professional photographs taken of the children and "posted" on a database of children up for adoption. Additionally, the children "get to go and have their hair and makeup done, and they get to do kind of their own recruitment video. They talk to the video camera about what they want in an adoptive family."

The burden to demonstrate that termination is in the child's best interest falls solely to DCS. *In re Gabriella*, 531 S.W.3d at 682; *see also In re Gabriella D.*, No. E2016-00139-COA-R3-PT, 2016 WL 6997816, at *21 (Tenn. Ct. App. Nov. 30, 2016) (Stafford, J., dissenting), *rev'd,* 531 S.W.3d 662 (Tenn. 2017) ("The burden of establishing the ground for termination and the best interest of the child by this high evidentiary burden is on the party seeking termination and never shifts to the parent."). Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). While we continue to have doubts that Mother will be able to maintain her sobriety long-term, we also have equally if not stronger doubts that the children's best interests will be served in this particular case by abandoning any hope of reunification and severing the ties between parent and child.

We therefore hope that this case serves as a reminder to Mother that her children remain in limbo and that her choices have profound effects on their lives. Certainly, we have been disappointed before. *Compare In re Wesley P.*, No. W2014-02246-COA-R3-PT, 2015 WL 3430090, at *1 (Tenn. Ct. App. May 29, 2015) (reversing the termination of the parent's parental rights on the basis of best interest), *with In re Wesley P.*, No. W2016-02131-COA-R3-PT, 2017 WL 1969762 (Tenn. Ct. App. May 12, 2017) (affirming the termination of the same father's parental rights after the father resumed his previous lifestyle and the mother had surrendered her parental rights). "Should Mother revert to the reprehensible conduct that started the process that culminate[d] with this decision, DCS will have the option of filing a termination petition." *In re Gabriella D.*, 531 S.W.3d at 686; *see also In re C.M.S.*, 2004 WL 2715331, at *8 ("This is not to say that termination of [the mother's] parental rights at some future time is foreclosed."). But the proof presented by DCS simply did not meet its high burden to show that Mother's parental rights should be terminated at this time.

## CONCLUSION

The judgment of the Circuit Court of Putnam County is reversed in part and affirmed in part. The termination of Melissa W.'s parental rights is reversed. Costs of this appeal are taxed to Appellee the Tennessee Department of Children's Services, for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

- 45 -